UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

GARY ALJOE and GARRETT ALJOE,

       Plaintiffs,

   v.                                      18-CV-1043-LJV-JJM
                                                DECISION & ORDER

CITY OF BUFFALO POLICE
DETECTIVE SHAWN ADAMS, *et al.*,

       Defendants.

---

On September 21, 2018, the plaintiffs, Gary and Garrett Aljoe, commenced this action under 42 U.S.C. § 1983. Docket Item 1. On January 16, 2019, the case was referred to United States Magistrate Judge Jeremiah J. McCarthy for all proceedings under 28 U.S.C. § 636(b)(1)(A) and (B). Docket Item 10. On August 11, 2020, defendants Town of Tonawanda Police Officers John Doe 1 and 2 and Derek Scott (the "Tonawanda defendants") moved for summary judgment. Docket Item 28. The next day, the other defendant, Detective Shawn Adams, likewise moved for summary judgment. Docket Item 30. On September 25, 2020, the Aljoes responded, Docket Items 36, 37, and on October 1 and 2, 2020, the defendants replied, Docket Items 38, 39. On November 5, 2020, Judge McCarthy issued a Report and Recommendation ("R&R"), finding that Adams's motion should be granted and that the Tonawanda defendants' motion should be granted in part and denied in part.

On November 18, 2020, Scott objected to the R&R, arguing that the R&R erred in recommending that Gary Aljoe's Fourth Amendment unreasonable seizure claim— against Scott for shooting and killing Gary Aljoe's dog Sarge—be allowed to proceed.

Docket Item 42.  On November 19, 2020, the Aljoes objected to the R&R, arguing that the R&R incorrectly recommended dismissal of their Fourth Amendment excessive force claim as duplicative of Gary Aljoe's unreasonable seizure claim.  Docket Item 43.  Scott responded to the Aljoes' objection on December 10, 2020, and the Aljoes responded to Scott's objection the next day.  Docket Items 45, 46.  Scott replied on December 18, 2020.  Docket Item 47.

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  The court must review *de novo* those portions of a magistrate judge's recommendation to which a party objects.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

This Court has carefully and thoroughly reviewed the R&R; the record in this case; the objections, responses, and reply; and the materials submitted to Judge McCarthy.  Based on that *de novo* review, the Court accepts and adopts Judge McCarthy's recommendation to grant Adams's motion for summary judgment and accepts Judge McCarthy's recommendation—albeit on slightly different grounds—to grant the Tonawanda defendants' motion for summary judgment in part and deny the motion in part.

## FACTUAL BACKGROUND

At the time of the conduct alleged in the complaint, Gary Aljoe, Garrett Aljoe, and Sarge, Gary Aljoe's seven-year-old German Shepherd, resided at 85 Ullman Street in Buffalo, New York.[1]  Docket Item 28-1 at ¶ 3; Docket Item 30-2 at ¶¶ 3-5.  85 Ullman is

---

[1] The Court assumes the reader's familiarity with the facts alleged in the complaint, *see* Docket Item 1, and Judge McCarthy's analysis in the R&R, *see* Docket

2

a single-family residence with a front entrance and an enclosed porch area.  Docket Item 30-2 at ¶ 4.  At the time, a "beware of dog" sign hung outside on the front door.  *Id.*

Adams, a detective in the Narcotics and Vice Unit of the Buffalo Police Department, testified that he had received two complaints about drug activity at 85 Ullman.  *See* Docket Item 30-2 at ¶¶ 6, 9; Docket Item 30-7 at 5-7.  He recalled that after he received these complaints, he "took out" a confidential informant "to make a controlled buy."  Docket Item 30-7 at 10.  Adams testified that the confidential informant made controlled buys of marijuana and heroin at 85 Ullman in October and December 2016.  Docket Item 30-2 at ¶ 11; Docket Item 30-7 at 11, 14-15, 18, 20, 23.[2]

On December 15, 2016, Adams and the confidential informant testified before Buffalo City Court Judge Thomas Amodeo in connection with an application for a warrant to search 85 Ullman.  Docket Item 28-1 at ¶ 14; Docket Item 30-2 at ¶ 17.  Judge Amodeo signed the search warrant for 85 Ullman that same day.  Docket Item 28-1 at ¶ 15; Docket Item 28-11; Docket Item 30-2 at ¶ 18.

Because of the "high number of warrants being executed at the time," the Buffalo Police Department asked the Tonawanda SWAT team to execute the search warrant at 85 Ullman.  Docket Item 28-1 at ¶¶ 18-19; Docket Item 30-2 at ¶ 20.  The Tonawanda defendants maintain that before executing the search warrant, the Tonawanda SWAT team would have been briefed on "what to expect" at the search.  Docket Item 28-1 at ¶¶ 20-21.  Although Scott did not specifically recall the briefing that preceded the search

---

Item 41.  Accordingly, the Court provides only a brief recitation of the facts relevant to the objections raised by the Aljoes and Scott.

[2] The Aljoes dispute that any controlled buys occurred at 85 Ullman.  Docket Item 37-1 at ¶ 11.

3

of 85 Ullman, he testified that in these pre-raid briefings, officers are "apprised as to potential threats" that they may encounter during a search, including "canines or dogs" that may be in the residence.  Docket Item 28-17 at 8-9.

The Tonawanda SWAT team also would have received and discussed a "raid planning questionnaire" prior to the search; that questionnaire identifies "any potential hazards, including the presence of dogs."  Docket Item 28-1 at ¶¶ 17, 22.  The Tonawanda defendants submitted a copy of the questionnaire, noting the presence of a "Big Dog" at 85 Ullman, in connection with their motion for summary judgment.  Docket Item 28-12.

In the early morning of December 20, 2016, the Tonawanda SWAT team executed the search warrant at 85 Ullman.  Docket Item 28-1 at ¶ 18; Docket Item 30-2 at ¶¶ 20-21.  Scott testified that he was the first officer to reach the house door.  Docket Item 28-1 at ¶ 24; Docket Item 28-17 at 26.  Because the door was locked, another officer used a battering ram to break it down.  *Id.*

At this point, the Aljoes' and Scott's accounts of what happened at 85 Ullman— and what happened to Sarge—diverge.  Scott testified that after the officers breached the door and entered the vestibule of 85 Ullman, Sarge "charge[d] toward [them]" and came "within two feet barking, snapping . . . [b]asically in attack mode."  Docket Item 28-17 at 45.  Scott did not "wait[] [] very long, but a split second or two" for Sarge to retreat; when Sarge did not, Scott "shot the dog."  *Id.* at 51.  Scott testified that even after Sarge was shot, the dog continued to "snap[] and bit[e] when he was laying [sic] down."  *Id.* at 59.  Scott "was afraid [Sarge] was going to pop up and still bite someone," so he "deemed him a threat" and "shot him again" after three to five seconds.  *Id.* at 59-60.

4

Two Tonawanda SWAT team members present at the search submitted affidavits setting forth their similar recollections of Sarge's aggressive behavior. *See* Docket Item 28-19, Docket Item 28-20.

Gary Aljoe recalled things differently. He testified that he was asleep in the front living room with Sarge next to him when the Tonawanda officers breached the door of 85 Ullman. Docket Item 30-4 at 55-56. After officers directed Gary Aljoe to get down, he lay on the floor of the living room facing away from Sarge. Docket Item 28-14 at 26-27; Docket Item 30-4 at 58-59. "[A]bout one or two minutes" after Gary Aljoe lay down, he turned and saw Sarge "laying there at the foot of the filing cabinet" near the "left-hand side of the porch." Docket Item 28-14 at 30. Gary Aljoe recalled that Sarge "didn't look too happy"; in fact, Sarge "was cowering" and "looked scared." *Id.* Neither of the Aljoes saw Scott shoot Sarge, however, and Garrett Aljoe testified that he was upstairs when Sarge was shot. *See* Docket Item 28-1 at ¶¶ 30-31; Docket Item 30-2 at ¶¶ 23-24; Docket Item 28-16 at 26-28.[3]

Sarge died on the scene. *See* Docket Item 28-14 at 38. Animal Control then removed Sarge's body from 85 Ullman, and the Aljoes later cremated him. Docket Item 30-2 at ¶ 25.

## **LEGAL PRINCIPLES**

"A motion for summary judgment may be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[3] Gary Aljoe testified that he believed Sarge had been shot once already when he saw him but that he did not actually see Scott shoot Sarge. *See* Docket Item 28-14 at 30-32.

matter of law.'" *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).  "Summary judgment is appropriate when 'there can be but one reasonable conclusion as to the verdict,' *i.e.*, 'it is quite clear what the truth is,' and no rational factfinder could find in favor of the nonmovant."  *Id.* (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); then quoting *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 467 (1962)).  Conversely, "[s]ummary judgment should be denied if, when the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party."  *Id.*  "In deciding such a motion, the court cannot properly make credibility determinations or weigh the evidence."  *Id.*  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Anderson*, 477 U.S. at 255.

## DISCUSSION

### I. GARY ALJOE'S UNREASONABLE SEIZURE CLAIM

"[T]he unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment."  *Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013).  "To determine whether a seizure is unreasonable, a court must 'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion' and determine whether 'the totality of the circumstances justified [the] particular sort of . . . seizure."  *Id.* (alterations in original) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).  "[T]he shooting of [a plaintiff's]

6

'dog [is] a severe intrusion given the emotional attachment between a dog and an owner'"; at the same time, "'ensuring officer safety' is a 'particularly significant governmental interest.'"  *Strong v. Perrone*, 2020 WL 1445877, at *2 (W.D.N.Y. Mar. 25, 2020) (alteration omitted) (quoting *Carroll*, 712 F.3d at 651).  In balancing the relevant factors, the Court evaluates an officer's actions "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Scott argues that the R&R "misapplied the facts as to when [Gary] Aljoe 'believed' he saw his dog" and therefore erred in concluding that "a question of fact existed as to whether or not the dog continued to be aggressive after Officer Scott shot it the first time."  Docket Item 42 at 3.  More specifically, Scott discredits Gary Aljoe's testimony that he saw his dog after lying on the floor for one to two minutes because "by this point his dog would have already passed away."  Docket Item 42 at 3.  Scott also notes that Gary Aljoe "admittedly did not see Officer Scott shoot the dog or even hear the shots take place" and "acknowledged that he was not wearing his glasses at the time of the incident."  *Id.* at 4.

Essentially, Scott argues that the R&R erred by not accepting his version of the facts.  His arguments about Gary Aljoe's credibility may well convince a jury, but they are not grist for the mill on summary judgment.  *See Anderson*, 477 U.S. at 255.

Gary Aljoe testified that Sarge "looked scared" and "was cowering" after the officers entered 85 Ullman.  Docket Item 28-14 at 30.  On the other hand, Scott testified that Sarge aggressively charged the officers when they entered the house and was shot

7

twice almost immediately.  Docket Item 28-17 at 45, 51, 60.  Both those stories cannot be true.  And while Scott may well be correct that there are inconsistencies with Gary Aljoe's story, those inconsistencies are for a jury to evaluate.  So as the R&R correctly concluded, the stark factual dispute between these two accounts precludes this Court from deciding that "a reasonable jury could [not] find that [Scott] behaved unreasonably in shooting [Sarge] in [the Aljoes'] home."  *Strong*, 2020 WL 1445877, at *3; *see id.* at *4-5 (denying summary judgment where "a reasonable jury could conclude that . . . [the plaintiff's dog] was not showing signs of aggression").[4]

Scott also faults the R&R for "ignor[ing] that when faced with a dangerous situation, police officers are not required to try varying degrees of nonlethal force before turning to lethal force."  Docket Item 42 at 4.  And it is true that "a fatal seizure may be justified even if [a] dog did not actually pose a danger to the officer" as long as "it was reasonable for the officer to believe that danger was imminent."  *Azurdia v. City of New York*, 2019 WL 1406647, at *7 (E.D.N.Y. Mar. 28, 2019).  But Scott's argument assumes its conclusion—namely, that Scott was "faced with a dangerous situation," or at least what reasonably seemed like a dangerous situation, justifying his lethal use of

---

[4] In his reply, Scott attempts to characterize his arguments not as a "request[] that the Court weigh any conflicting evidence," but as objecting to the R&R's reliance on Gary Aljoe's "factual[ly] impossib[le]" testimony.  Docket Item 47 at 2.  Specifically, Scott claims that because Gary Aljoe was "looking away after the officers breached the home," was "not wearing his glasses," and did not "see[] or hear[] the shots," his "testimony could not have happened[] and . . . should be wholly disregarded."  *Id.*  But the Court finds no "factual impossibility" here:  Gary Aljoe testified that he "turned around" to view Sarge at some point and that he "didn't need [his glasses] for sight."  Docket Item 28-14 at 25, 30.  Nor does the fact that Gary Aljoe did not see or hear Scott shoot Sarge bear on whether his testimony—that he saw his dog alive and cowering during the search—is possible.  At bottom, Scott's arguments are about credibility and weight, which are not matters for the Court to resolve at this stage.  *See Anderson*, 477 U.S. at 255.

force.  The parties' disagreement about any danger that Sarge posed at the time of the search is the very dispute that precludes summary judgment now.  Moreover, as the R&R noted, *see* Docket Item 41 at 14, Scott testified that he shot Sarge a second time while the dog was "laying [sic] down," Docket Item 28-17 at 59, raising questions about whether Scott's entire course of conduct—not simply his initial decision to shoot—was objectively reasonable.  *See Carroll*, 712 F.3d at 651.

Scott also contends that the R&R incorrectly relied on *Carroll* for the proposition that "there may very well be circumstances under which a plaintiff could prove that lack of an adequate plan rendered the shooting of his or her dog unreasonable even during execution of a no-knock warrant."  Docket Item 41 at 12 (alteration omitted) (quoting *Carroll*, 712 F.3d at 653).  According to Scott, only "plan[s] devised by municipal defendants," rather than an individual officer's plan in executing a search warrant, can be considered in determining whether a seizure is objectively reasonable.  Docket Item 42 at 6.

But contrary to Scott's cramped reading, *Carroll*'s message is not so limited.  In fact, the Second Circuit in *Carroll* "agree[d] with the Ninth Circuit that the failure to plan adequately for the presence of dogs during a search could contribute to a Fourth Amendment violation under certain circumstances."  712 F.3d at 652 (citing *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 976-78 (9th Cir. 2005) ("*Hells Angels*")).  And in *Hells Angels*, the Ninth Circuit held that "[a] *reasonable officer* should have known that to create a plan to enter the perimeter of a person's property, knowing all the while about the presence of dogs on the property, without considering a method for subduing the dogs besides killing them, would violate

9

the Fourth Amendment." 402 F.3d at 978 (emphasis added). So the Ninth Circuit, and by extension the Second Circuit, indeed have found that an individual officer's plan in executing a search warrant can be considered in determining whether a seizure is objectively reasonable.

Finally, Scott contends that "any [] argument" that a plan could have prevented the killing of the Aljoes' dog is "purely speculative." Docket Item 42 at 6. Again, that may be a good argument for the jury, but it is premature now. The warrant was executed five days after it was issued, *see* Docket Item 28-11; Docket Item 28-17 at 3-4; in the interim, Scott likely was briefed on "potential threats that [he] may [] encounter[]" at 85 Ullman, including "canines or dogs," Docket Item 28-17 at 7-8. And the evidence submitted by the Tonawanda defendants suggests that Scott and his colleagues indeed knew about Sarge prior to the search. *See* Docket Item 28-12. So Scott and his colleagues had time to plan, and a plan to deal with the dog might well have changed what happened. In any event, the existence of a plan or the absence of a plan are relevant considerations for a jury to weigh in deciding whether Scott's shooting Sarge was objectively reasonable. *See Hells Angels*, 402 F.3d at 977 ("While the governmental interest of safety might have provided a sound justification for the intrusion had the officers been surprised by the presence of the dogs, the same reasoning is less convincing given the undisputed fact that the officers knew about the dogs a week before they served the search warrants.").[5]

---

[5] In his reply, Scott raises a last-ditch contention that the Aljoes "should not now be given an opportunity to present a brand[-]new claim against Officer Scott" related to Scott's lack of a plan to use non-lethal force. Docket Item 47 at 4. But the Aljoes' arguments do not raise a "brand-new" claim; rather, they simply bear on whether Scott's actions were objectively reasonable under the circumstances. That is part and parcel of

All those factual issues are jury questions that preclude summary judgment. The Court therefore adopts Judge McCarthy's recommendation to deny Scott's motion for summary judgment.[6]

## II. THE ALJOES' EXCESSIVE FORCE CLAIM

Gary and Garrett Aljoe object to Judge McCarthy's recommendation that their Fourth Amendment excessive force claim be dismissed as duplicative of Gary Aljoe's Fourth Amendment unreasonable seizure claim. In concluding that these claims are duplicative, the R&R reasoned that "whatever claim of 'excessive force' plaintiffs" allege regarding Scott's actions "would hinge on the same considerations as their unreasonable seizure claim – *i.e.*, whether Officer Scott's decision to discharge his firearm was 'reasonable.'" Docket Item 41 at 16. Because "duplicative claims shall be dismissed when they are based on identical conduct and seek the same relief," the R&R recommends that the Aljoes' excessive force claim against Scott be dismissed.[7] *Id.*

---

the same Fourth Amendment claim that Gary Aljoe has made all along. *See* Docket Item 1 at ¶¶ 76-83.

[6] Scott does not contest the R&R's finding that qualified immunity does not provide a basis for summary judgment here, and the Court agrees with the R&R in that regard. *See Azurdia*, 2019 WL 1406647, at *8 (citing *Carroll* in concluding that "the law [is] clearly established that the fatal seizure of a pet without justification constitutes a Fourth Amendment violation"). Likewise, Scott does not object to the R&R's conclusion on punitive damages, and the Court concurs with the R&R on this score as well. *See Lin v. County of Monroe*, 66 F. Supp. 3d 341, 362-63 (W.D.N.Y. 2014) ("Generally, the issue of whether to award punitive damages is an issue for the jury to decide based on an evaluation of the plaintiffs' proof of sufficiently serious misconduct." (alterations and citation omitted)).

[7] Although the proof of liability on the unreasonable seizure claim and the excessive force claim might be the same, the damages to which the plaintiffs would be entitled would be different. Indeed, only Gary Aljoe brings the seizure claim while both Gary and Garrett bring the excessive force claim. *See* Docket Item 1 at ¶¶ 63-83. So

11

(alteration omitted) (quoting *Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Oregon, Inc.*, 156 F. Supp. 3d 348, 362 (E.D.N.Y. 2016)).

The Court need not decide whether the Aljoes' excessive force claim is duplicative, however, because it fails for other reasons. "The Fourth Amendment protects individuals from seizures executed with excessive force." *Dancy v. McGinley*, 843 F.3d 93, 116 (2d Cir. 2016) (citing *Graham*, 490 U.S. at 393-94). Like Gary Aljoe's Fourth Amendment unreasonable seizure claim, the Aljoes' Fourth Amendment excessive force claim requires the Court to carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (quoting *Graham*, 490 U.S. at 396).

But the complaint does not allege the use of *any* force—let alone excessive force—against the plaintiffs personally. Instead, the Aljoes assert that "the use of a firearm and the manner in which the search was conducted trigger a use of force claim." Docket Item 1 at ¶ 73. But the Aljoes offer nothing connecting Scott's "use of a firearm" against *Sarge* to any allegedly excessive force used against *them*. Nor do they allege that the defendants struck them or otherwise used force against them in any way.[8]

Indeed, neither Gary nor Garrett actually saw—or even heard—Sarge get shot. Gary testified explicitly that he did not see Sarge "being shot either once or twice," and

---

even if the two claims would require the same proof on liability, there would be good reason to allow both to proceed if both were viable.

[8] As the R&R noted, Gary Aljoe's assertion that he was "nearly shot and killed" when Scott discharged his firearm finds no support in the record. Docket Item 41 at 16. Even more significantly, similar allegations are not even included in the complaint. *See generally* Docket Item 1.

12

that he was not "sure if [he] heard it or not because of the noise." Docket Item 28-14 at 32. And Garrett was not even on the same floor that the shooting occurred. Docket Item 28-16 at 26-28. In other words, the Aljoes simply allege that they were inside the house when Scott used force against Sarge and saw Sarge after he was shot. That is insufficient to state an excessive force claim against them.

Neither of the "prior precedent[s]" cited by the Aljoes suggests that a plaintiff may bring an excessive force claim under such attenuated circumstances. *See* Docket Item 43 at 2. In *Fulks ex rel. Daniel v. Gasper*, 439 F. Supp. 2d 372 (M.D. Pa. 2006), the plaintiff, as the guardian of her minor child, claimed that an officer used excessive force over the course of an early-morning raid. But the officer in *Fulks* allegedly "discharged his shotgun in the direction of" the child and shot a dog that was "next to" the child. *Id.* at 377. As a result, the child was "struck in the right foot and leg by four pellets"; two of those pellets "remain[ed] embedded in his right foot" at the time of the suit. *Id.* at 374-75. So unlike the plaintiffs here, the minor plaintiff in *Fulks* was physically injured by the use of allegedly excessive force directed at the dog.

*Smith v. City of Buffalo*, 2020 WL 8083655 (W.D.N.Y. Sept. 29, 2020), is a bit more on point but still misses the mark. In *Smith*, the plaintiff testified that he watched police officers shoot a dog in his bedroom and was traumatized by the shooting. *Id.* at *3. Under those circumstances, the court concluded that a "jury could [] find for [the plaintiff] on his excessive force claim based on his close proximity to [the dog] when [the dog] was shot" and consequently recommended that the plaintiff's excessive force claim survive a motion for summary judgment. *Id.* at *9 (citing *Terebesi*, 764 F.3d at 240-41 (permitting excessive force claim to proceed where the plaintiff "suffered physical

13

injuries" from officer's use of force against him as well as "emotional and psychological injury" from officer's fatal shooting of a houseguest in the plaintiff's presence)).  Here, on the other hand, neither of the Aljoes even witnessed Scott shoot Sarge.  Docket Item 28-1 at ¶¶ 30-31.  And that difference is dispositive.

If anything, *Smith* illustrates just how tenuous the Aljoes' excessive force claim is here:  In *Smith*, only the plaintiff who witnessed the animal shooting—not the dog's owner who also was present in the house during the search—sought to recover for the allegedly excessive use of force.  *Smith*, 2020 WL 8083655, at *3, *9.  Whatever guidance *Smith* offers to the Aljoes' claim in this case, it suggests that a dog owner who does not actually witness but instead later learns of his or her dog's death does not have an excessive force claim.  And that is consistent with related principles of tort law:  To recover for intentional infliction of emotional distress based on an individual's extreme and outrageous conduct toward a third party—effectively, what the Aljoes' excessive force claim alleges here—a plaintiff must "contemporaneously perceive[] the event," not simply "discover[] what has occurred later."  RESTATEMENT (THIRD) OF TORTS § 46 cmt. m.

The Aljoes' Fourth Amendment excessive force claim thus falls well short of stating a claim based on force used against a pet.  For that reason, the Court accepts the R&R's recommendation to dismiss the excessive force claim.

### III.  THE ALJOES' REMAINING CLAIMS

The Aljoes do not object to the R&R's findings that their claims against the remaining John Doe defendants and their claims against Adams be dismissed.  In any event, the Court agrees with the R&R's recommendations in this regard.  The Aljoes

have not ascertained the identities of the John Doe defendants, and their claims against them are now time-barred.  *See Abreu v. City of New York*, 657 F. Supp. 2d 357, 363 (E.D.N.Y. 2009).  And the Court agrees that the Aljoes have failed to adequately demonstrate that Adams "'knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit' or omitted material information, and that such false or omitted information was 'necessary to the finding of probable cause.'" *McColley v. County of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014) (quoting *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993)).  The Aljoes' claims against the John Doe defendants and Adams therefore are dismissed.

## **CONCLUSION**

For the reasons stated above and in the R&R, the Tonawanda defendants' motion for summary judgment, Docket Item 28, is GRANTED in part and DENIED in part, and Adams's motion for summary judgment, Docket Item 30, is GRANTED.  Gary Aljoe's Fourth Amendment unreasonable seizure claim against Scott, including his demand for punitive damages, may proceed.  The Clerk of the Court shall terminate defendants Adams and John Does 1-2 as parties to this action.  **The parties shall contact the Court within 30 days of the date of this order to schedule a status conference so that the Court can set a trial date.**

SO ORDERED.

Dated:  September 30, 2021
        Buffalo, New York

                                              */s/ Lawrence J. Vilardo*
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE